UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:07-cv-147

| | | |
|---|---|---|
| HOFFMAN ENGINEERING CORPORATION, | ) ) | |
| Plaintiff, | ) ) | ORDER |
| v. | ) ) | |
| MICHAEL PISCITELLI, and SAPPHIRE TECHNICAL SOLUTIONS, LLC | ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

This case arises out of a confidentiality agreement between Plaintiff Hoffman Engineering Corporation ("Hoffman" or the "Company") and a former employee and consultant Defendant Michael C. Piscitelli's ("Piscitelli"). It appears that at some point, not specified in the record, that Piscitelli started his own company, Defendant Sapphire Technical Solutions, LLC. Hoffman alleges Pisceitelli has violated the confidentiality agreements, that Sapphire has intentionally interfered with those confidentiality agreements, and that both defendants have misappropriated Hoffman's trade secrets. Presently before the Court is the plaintiff's uncontested Motion for Preliminary Injunction against defendants.[1] The record reflects that on April 11, 2006 the Motion was properly served upon the defendants. (Doc. No. 6: Motion: Certificate of Service). Based upon this evidence of proper service and for the reasons stated below, the Court will GRANT the plaintiff's Motion.

---

[1] Because the defendants did not respond to the instant motion, the Court assumes for purposes of deciding the motion that the factual averments by Hoffman are true.

1

**FACTUAL BACKGROUND**

Hoffman is a specialized engineering company founded in 1955. Its expertise is in photometrics, which is the measurement of light. Hoffman provides specialized photometric testing services for its customers at its Stamford, Connecticut laboratory. It also designs, manufactures and sells highly specialized photometric testing machines to large customers in the automobile and aerospace industries. These types of machines are called goniometers.

Hoffman has devoted a significant amount of time and resources to develop a line of photometric goniometers called Automated Goniometer Systems or "AGS." AGS machines are technical pieces of equipment consisting of numerous complex, interrelated components and sub-components. Hoffman alleges that both the source code for the AGS software and the design, engineering, manufacturing and testing documents for the machines constitute the confidential information and trade secrets.

Hoffman hired Piscitelli as an Electrical Engineer in 1993. He had just received a college degree, and had no experience with photometrics or goniometers. Piscitelli worked his way up at Hoffman, ultimately becoming the Systems Engineer in charge of AGS projects.

Throughout his employment with Hoffman, Piscitelli had possession of and intimate knowledge about detailed aspects of Hoffman's AGS technology. For example, he had the source code for the AGS software and intimate knowledge about it resulting from his lengthy employment. Similarly, he had possession of and used in the course of his job many (if not all) of the hundreds of detailed design, engineering, manufacturing and testing documents for the AGS machines and their components and sub-components.

In February 2005, Piscitelli resigned as an employee and became a consultant to Hoffman.

As a result, he and Hoffman entered into two consulting agreements, one in February 2005 and another in October 2005. The Consulting Agreements contained provisions requiring Piscitelli to preserve Hoffman's confidential information and return all equipment, property and confidential information at the end of the consulting relationship.[2] Piscitelli's consulting relationship with Hoffman ended in early 2006.

In February 2007, Hoffman learned that the defendants had submitted a bid to one of the Company's existing customers, North American Lighting, Inc. ("NAL"), in direct competition with Hoffman. NAL awarded the contract to the defendants instead of Hoffman. Under the contract, the defendants would be (i) updating three of NAL's existing Hoffman AGS machines, and (ii)

---

[2] The pertinent provisions of the February 2005 agreement provides:
Consultant will not directly or indirectly communicate to, divulge to, or use for his benefit or the benefit of any other person or entity, any or all information, knowledge, or know-how not generally known about the Company, its services, standards, procedures, techniques, and other such information or material that is a trade secret and proprietary to the Company, or which the Company designates as confidential . . . The obligations and restrictions set forth in this Section … shall be in full force and effect during the full term of this Agreement, and shall survive the termination or expiration of this Agreement, and shall remain in full force and effect for so long as the Company remains in existence.
(Doc. No. 1: Verified Complaint: Exhibit C, Section 5 (c)).

The pertinent provisions of the October 2005 agreement provides:

6. Confidentiality
Consultant acknowledges that he/she may have access to Client's [Hoffman's] confidential and proprietary information. Such confidential information may include, without limitation: i) business and financial information, ii) business methods and practices, iii) technologies and technology strategies, iv) marketing strategies and v) other such information as Client may designate as confidential ("Confidential Information"). Consultant agrees to not disclose to any other person (unless required to do so by law) or use for personal gain any Confidential Information at any time during or after the term of this Agreement, unless Client grants express, written consent of such disclosure. In addition, Consultant will use his/her best efforts to prevent any such disclosure. . . .

10. Return of Property
Upon termination or completion of this Agreement, Consultant will promptly return to Client all drawings, documents and other tangible manifestations of Confidential Information (and all copies and reproductions thereof). In addition, Consultant will return any other property belonging to Client including without limitation: computers, equipment, office supplies, money and documents.
(Doc. No. 1: Verified Complaint: Exhibit D).

designing and manufacturing a new photometric goniometer for NAL. Hoffman argues that the defendants cannot perform that work for NAL, nor can they perform similar work for other customers, without using Hoffman's confidential information and trade secrets. To do the work necessary to update an existing AGS machine, the defendants allegedly must have and use the source code for the AGS software, and must have and use the numerous design and engineering documents for that type of AGS machine and its components and sub-components. Similarly, the defendants allegedly do not have the ability to design a new photometric goniometer without having and using Hoffman's confidential information and trade secrets.

When Piscitelli's consulting relationship with Hoffman ended in early 2006, he did not return all of the equipment, property and confidential information that he had received during his tenure as an employee and consultant for the Company. Hoffman believes that the defendants intend to use (and may already be using) those materials to perform the work for NAL and to make bids to and perform work for other customers.

As a result, Hoffman seeks preliminary injunctive relief to (i) require the defendants to return all Hoffman equipment, property and confidential information; (ii) prevent the defendants from performing any work to update any existing AGS machines; and (iii) prevent the defendants from designing or manufacturing any new complex photometric goniometers.

## ANALYSIS

The Fourth Circuit has recognized that the grant of interim relief is an "extraordinary remedy" which is to be applied only in limited circumstances which clearly demand it. <u>Direx Israel, Ltd. v. Break Through Med. Corp.</u>, 952 F.2d 802, 811 (4th Cir. 1992). Accordingly, the Fourth Circuit has set forth a four-part test for the entry of a preliminary injunction. Those four factors are:

"(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." Break Through Med. Corp., 952 F.2d at 812 (4th Cir. 1992) (citing Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc., 550 F.2d 189 (4th Cir. 1977) (for originally setting forth the four-part test)). The Fourth Circuit "has consistently followed the 'hardship balancing test' as stated in Blackwelder."[3] Break Through Med. Corp.,952 F.2d at 811. Under that test, "[t]he irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." Id. See also In re Microsoft Corp. Antitrust Litigation, 333 F.3d 517, 526 (4th Cir. 2003) ("Emphasis on the balancing of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa"). "Moreover, the required 'irreparable harm' must be 'neither remote nor speculative, but actual and imminent.' " Break Through Med. Corp.,952 F.2d at 812 (citing Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d cir. 1989)).

Notwithstanding the difficult burden on the moving party, injunctive relief is available for

---

[3] The Fourth Circuit has provided the following description of the two predominate standards for granting injunctive relief:
> Federal courts have developed two distinct standards to govern the grant of such relief. One of these standards, often referred to as the "traditional" test, is the "likelihood-of-success" standard; the other standard is the "hardship balancing test." The essential difference between these two standards is that while the first begins its inquiry with the determination of "likelihood of success" on the merits and proceeds to consider in sequence other factors embraced within the standard, the second begins by balancing the harm or injury imposed on the plaintiff in the event relief is denied against the harm to the defendant if the relief is granted, and on the basis of such balancing proceeds to determine the degree by which a "likelihood of success" on the merits must be established before relief may issue. Illustrative of the first standard is Northern Alaska Environmental Ctr. v. Hodel, 803 F.2d 466, 471 (9th Cir.1986); illustrative of the second standard is Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 195 (4th Cir.1977).

Break Through Med. Corp.,952 F.2d at 811.

breach of contract and tortious interference. Zahodnick v. Intern'l Business Mach. Corp., 135 F.3d 911, 915 (4th Cir. 1997) (affirming a preliminary injunction requiring defendant to return all confidential information retained it in violation of confidentiality agreement). It is also available for misappropriation of trade secrets. Servo Corp. of America v. Gen. Elec. Co., 337 F.2d 716, 723 (4th Cir. 1964); see also Colgate-Palmolive Co. v. Carter Prods., Inc., 230 F.2d 855, 865 (4th Cir. 1956) (the "rule is well settled that secret formulas and processes … are property rights which will be protected by injunction. . . .").

In the present case, the defendants have a contract with NAL that will allegedly require the use of Hoffman's confidential information and trade secrets. The defendants allegedly have not yet designed or manufactured a complex photometric goniometer, but plan to do so for NAL.

The defendants' use of confidential information, trade secrets, and the materials to perform the contract for an existing Hoffman customer presents an actual and immediate threat of irreparable harm to Hoffman. The harm caused by this contract would be irreparable because the development of these machines is so expensive and specialized that there are only a few companies worldwide that design and manufacture complex photometric goniometers, which results in Hoffman having few competitors, and Hoffman selling only a few AGS machines annually. However, these products generate disproportionately high revenue. For example, Hoffman is the dominant player in North America, even though it has only about 50 machines deployed here. A sale of just one AGS machine could generate initial revenue from $250,000 to $500,000. Thus, Hoffman's sale of only a few AGS machines annually still accounts for about 10% of the Company's revenue. A sale of just one goniometer is an important matter to Hoffman, and the loss of just a few sales over a few years would be devastating to Hoffman's goniometer business and harmful to its overall financial position.

Therefore, the irreparable harm that would quickly result from the February 2007 contract between the defendants and NAL is imminent as well as actual.

Additionally, Hoffman argues that the small size and limited resources of the defendants would prevent them from being able to pay a judgment due with respect to the NAL contract, which would be worth at least $500,000, or any greater damages resulting from the loss of other customers. Hoffman accordingly argues that the defendants would be unable to pay a judgment for such damages.

While the imminent threat of irreparable harm to Hoffman is significant, the threat of harm to the defendants as a result of a preliminary injunction is comparably small. Hoffman is only seeking an injunction requiring the defendants to return the Company's confidential information and trade secrets, and preliminarily enjoin them from updating Hoffman's existing AGS machines and designing and manufacturing new complex photometric goniometers. The potential harm to the defendants while such a preliminary injunction is pending is small because Piscitelli can continue to earn a living by servicing goniometers for customers in the field, as he did previously from at least March 2006 to mid-2007.

Because the balancing of the harms tips heavily in favor of Hoffman, there is no need to show a strong likelihood of success on the merits. However, Hoffman has made a compelling argument of its likelihood of success, and the defendants have not responded.

## CONCLUSION

For the foregoing reasons, the Court finds that the plaintiff has sufficiently demonstrated the necessity of a preliminary injunction to prevent the actual and imminent irreparable harm posed by the defendants' recent actions. Therefore, the Court **GRANTS** the plaintiff's Motion for Preliminary

Injunctive Relief, and **HEREBY ORDERS**:

1. the defendants to return all Hoffman equipment, property and confidential information;

2. that the defendants refrain from performing any work to update any existing AGS machines; and

3. that the defendants refrain from designing or manufacturing any new complex photometric goniometers.

**SO ORDERED.**

Signed: July 9, 2007

Robert J. Conrad, Jr.
Chief United States District Judge